Kenneth C. Johnson, Jr., J.
This is a proceeding in the .sentencing of a youthful offender who was originally indicted by the Grand Jury on charges of robbery in the first degree and possession of a deadly weapon alleged to have been committed late at night on the footbridge over Cascadilla Gorge in the City of Ithaca near the Cornell University campus. Permission has been granted by said youthful offender and his attorney for the publication of this sentence even though defendant may be easily identified locally by the references herein.
To me this is a tragic example, of what can go wrong, in the operation of the program at Cornell known as “ COSEP ”,— Committee on Special Education Projects — (and other similar programs at other universities and colleges) which is intended to help a minority group and to take some of the people out of the ghettos and give them the opportunities of a college education. The program is, as I understand it, for the purpose, among other things, to give the underprivileged and less fortunate “ youth ” who cannot financially afford it, the same educational and .social background that others in society experience who are more fortunate and who are able to afford such an education and its benefits. I say 1 ‘ youth ’ ’ in quotes because I know of one individual who was in such program attending Cornell who physically beat a professor so violently, he nearly killed him and who was an ex-convict, known drug user and about 34 years of age. Something is obviously wrong with the selection process in enrolling a person of such known, background and placing him in the over-all younger student community. The defendant before me may not have been a recipient in the “ COSEP ” program or, at least, if he was he did not have to be, since he was an excellent student and undoubtedly could have gone to any college or university he wished on scholarships. This was clearly brought out in the testimony *747 during his trial and again in the presentence investigation which sets forth his schooling as follows: 1‘ The defendant entered the public school 'system in Kindergarten in 9/58 at P. S. 168 Brooklyn. He apparently made a good adjustment and the father produced commendation cards * * 5 to verify this. In 9/60 the defendant entered P. S. 148 also in Brooklyn. Report cards verify the youngster produced work of excellent quality. * * * Lefferts Jr. High School in 9/63. He maintained a high average and displayed commendable conduct, again verified by commendation certificates. The defendant entered Erasmus High School in Brooklyn in 9/67. He maintained a 90 plus average all through high school and was a recipient of the Holmes Medal for the 90 average throughout high school. * * * went on to win a full 1ST. Y. State Regent Scholarship. Upon graduation in 6/68 * * * was awarded a scholarship to Cornell University.”
However, it did not take the other minority students in the “ COSEP ” program long to take care of such an exemplary record. In nothing flat, they molded this young student, age 16, from an outstanding student when he entered Cornell to not only a very poor student but also to their ways and to their level in their maladjusted society, for example, among other things: On December 12, 1968 he was one of the subjects mentioned in a complaint of criminal harassment involving the use of toy guns — again in December of 1968 he was one of a group of about 20 blacks who disrupted a Columbia basketball game at half time. In April, 1969 he was involved in the Willard Straight (Cornell University Student Commons Building) takeover— and in May the incident for which he is now being sentenced, which involved an armed robbery and in which it was very fortunate someone did not get killed.
There is no question in my mind that as soon as this defendant became involved with the residents of the Cornell University owned black men’s co-op at 409 Elmwood Avenue, he became a different person and was easily led as a young man of 16 years by the wrong people. By providing such a black men’s co-op, the university practices segregation. The results of the “ COSEP ” program for some of the recipients become a program of integration in reverse. It is a costly program that therefore, in some cases, accomplishes nothing it is proclaimed to accomplish and nothing for which it was intended — and in this case, in my opinion, very nearly ruined the future career of a bright young scholar who had previously displayed commendable conduct and was of exemplary character.
*748 I note that this defendant made the dean’s list at ithe university he went to as soon as he left Cornell and got away from his former associates and his associations here in Ithaca. That, in itself, speaks well for the defendant and perhaps he can now pursue the potential he had prior to entering Cornell. It also speaks obvious, clear and loud, as one of the results of the “ COSEP ” program at Cornell as it now exists. If just one student as a result of this program ends his schooling at Cornell in the same way as this defendant, something should be done, and done immediately. Just fortunately in this particular incident no one was killed. In the presentence investigation, the defendant’s father stated that his son had never posed a behavior problem and he was at a loss to explain his .son’s implication in the instant offense. I believe the explanation is as I have stated — I, therefore, urge the defendant to disassociate with any connections, if any he now has, with those persons responsible for guiding or directing him and shaping his life towards a life of one who engages in criminal activity or offenses against morality or the more correct ideals or principles of human conduct and I urge him ¡to disassociate with any similar program if it tends to lead to the same result as it did at Cornell. I urge him now he has left Cornell to go about the business of educating himself and to pursue the promising career he should have in the future if he continues in a scholarly manner.
Since Cornell University (as well as other universities and colleges) provides, as part of the “ COSEP ” program, the financial aid its recipients receive, it does have a ‘1 lever ’ ’ or means of controlling and. thereby supervising all persons in the program. The university should establish and set forth the necessary rules and restrictions necessary to assure the proper conduct and associations of such students. Since the university in such cases provides the financial means, it should be able and have the right to set reasonable standards and rules in return for such aid. Such a right has been upheld by the court where a parent provides the support and tuition for his daughter. In the case of Roe v. Doe (36 A D 2d 162) the court held that the father in return for his maintenance and support is entitled to set reasonable standards, rules and regulations for his daughter and if his daughter does not choose to comply, she is not entitled to the father’s support. The same reasoning could be applied to the situation where the university provides the financial means possible for the students’ attendance at college.
Most university administrators these days have agreed— I think too readily — that the university no longer (if it ever *749 really did) acts as loco parentis. However, from the acts of violence committed on the campus today, the fact that it is unsafe at night to walk across the campus, the repeated crimes of assault, rape and robbery or the attempts at such, it is certainly indicated that the university has gone much too far the other way. By exercising no control, no standards, no restrictions and by providing the means, lodging and associations for some of the students in the 11 COSEP ” program, Cornell University will continue to produce and foster the exact same results — or perhaps more serious results — as I believe it did in this case — a student who not only behaved in a manner that was a gross deviation from his previous exemplary character, but who became involved criminally.
Because the defendant has again resumed the pursuit of his college degree — and, as I mentioned, made the dean’s list the fall semester at another university immediately following his leaving Cornell — and has no record (except an exemplary one) prior to or after leaving Cornell and because I believe his involvement here at Cornell was the result of becoming associated and led by the wrong people for the reasons I have previously mentioned, I hereby sentence the defendant to a term of probation for a period of five years. I do so sentence the defendant to the term of probation also because of the malicious and violent nature of the type of crime involved and because I believe he will benefit from the supervision and guidance which the Probation Department may provide to assure defendant he does ¡noit again become misled and misguided by the wrong people. The defendant is hereby placed under the supervision of the Probation Department under the general and special conditions as follows:
Conditions of probation read to defendant.